UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JAMES COUCH,

Plaintiff,

v.                                                        Case No.  5:04-cv-422-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

Defendant.

_____

## REPORT AND RECOMMENDATION[1]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") terminating Plaintiff's disability benefits because of

medical improvement related to Plaintiff's ability to work. (Doc. 1.)  The Commissioner

has answered (Doc. 4), and both parties have filed briefs outlining their respective

positions.  (Docs. 11 & 15.)  For the reasons discussed below, the Court finds that the

Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance

benefits on January 23, 1990, alleging an onset date of November 1, 1988.  (R. 85.)  In

March of 1990, Plaintiff was found entitled to a period of disability commencing

November 24, 1988 due to major depression which met listing 12.04A and B of the

Listing of Impairments (the "Listings").  (R. 29, 101.)  After a continuing disability review

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

in June of 2001, Plaintiff was found no longer to be disabled.  (R. 27-28, 101-103.)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was

held on December 17, 2003.  (R. 34.)  On January 24, 2004, following the hearing, the

ALJ, Franklin D. Holder issued a decision unfavorable to Plaintiff.  (R.15-24.)  Plaintiff's

request for a review of that decision was denied by the Appeals Council on July 23,

2004 (R. 4-6), rendering the ALJ's decision the final decision of the Commissioner.  On

September 14, 2004, Plaintiff filed the instant complaint with this Court seeking review

of the Commissioner's final decision.  (Doc. 1.)

## II. <u>ISSUES PRESENTED</u>

Plaintiff argues that the ALJ erred in four respects.  First, Plaintiff contends that

the medical evidence in the record does not support the ALJ's finding that the Plaintiff's

condition had improved.  Second, Plaintiff asserts that the ALJ erred in finding Plaintiff's

mental impairment "not severe." Third, Plaintiff argues that even if the Plaintiff's

condition had improved with regard to the original Listing, the ALJ erred by not

considering Plaintiff's other impairments which met a different Listing. Finally, Plaintiff

contends that it was improper for the ALJ to rely on the Grids without utilizing a

vocational expert because Plaintiff had significant "non-exertional" impairments.

(Doc.11.)

The Commissioner asserts in response that there was substantial evidence to

support the ALJ's findings that Plaintiff's condition had improved.  The Commissioner

also contends that the ALJ correctly found that Plaintiff's mental impairment, while

severe, was not severe enough to affect his ability to do basic work activities. The

Commissioner argues that the ALJ properly found that Plaintiff's impairments did not

meet or equal a Listing.  Lastly, the Commissioner asserts that the ALJ did not have to utilize a vocational expert because the non-exertional impairments did not impact Plaintiff's RFC.

### III.  STANDARD OF REVIEW

### A.  Continuing Disability Review

The instant case does not involve the review of an initial application for disability benefits, but rather a review of Plaintiff's continuing disability in order to determine if he remains eligible to receive benefits. In determining whether a claimant's disability continues or ends, the Commissioner must determine whether there has been any medical improvement in the claimant's impairment(s) and, if so, whether the medical improvement is related to the claimant's ability to work.[2]  In determining whether medical improvement has occurred the Commissioner will compare the "current" – i.e. at the time of the decision to continue or discontinue benefits – medical severity of the impairment(s) to the medical severity of the impairment(s) at the time benefits were awarded.[3]

Medical improvement is defined as any decrease in the medical severity of the claimant's impairment(s) that was present at the time of the most recent favorable medical decision that the claimant was disabled.[4]  A finding of a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory

---

[2] 20 C.F.R. § 404.1594(a).

[3] 20 C.F.R. §404.1594(b)(7).

[4] 20 C.F.R. §404.1594(b)(1).

findings associated with the claimant's impairment(s).[5] Symptoms are the claimant's description of the impairment(s).[6] Signs are abnormalities which can be observed and must be shown by medically acceptable clinical diagnostic techniques.[7] Laboratory findings are from medically acceptable laboratory techniques.[8] Medical improvement is related to the claimant's ability to do work if there has been a decrease in the severity of the impairment(s) present at the time of the most recent favorable medical decision that the claimant was disabled and an increase in the claimant's functional capacity to do basic work activities.[9] Section 404.1594(f) outlines the evaluation steps to be taken in reviewing whether a claimant's disability continues.  These steps are:

> (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant's disability status will cease.

> (2) If no, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 [of the regulations]?

> (3) If no, has there been medical improvement in the claimant's condition?  If yes, proceed to Step 4.  If no, the claimant's disability continues.

> (4) Is the medical improvement in the claimant's condition related to his ability to work?  If no, proceed to Step 5.  If yes, proceed to Step 6.

---

[5] *Id.*

[6] 20 C.F.R. §416.928(a); 20 C.F.R. §404.1528(a).

[7] 20 C.F.R. §416.928(b); 20 C.F.R. §404.1528(b).

[8] 20 C.F.R. §416.928(c); 20 C.F.R. §404.1528(c).

[9] 20 C.F.R. §404.1594(b)(3).

(5) If the medical improvement in the claimant's condition is not related to his ability to work, do any of the exceptions[10] listed apply?  If no, the claimant's disability continues.

(6) If the medical improvement is found to be related to the claimant's ability to work, the Commissioner will determine whether all of the claimant's current impairments, in combination, are severe.

(7) If these impairments are severe, the Commissioner will assess the claimant's residual functional capacity to determine whether the claimant can perform his past relevant work.  If the Commissioner determines that the claimant can perform his past relevant work, his disability status will cease.

(8) If the claimant can no longer perform his past relevant work, the Commissioner will assess whether the claimant can do other work.  If he can, his disability status will cease.

In the case of a determination as to continuing disability, the court must review

the Commissioner's final decision in terms of both the eight-step analysis outlined above

and the general substantial evidence standard of review.  Therefore, the appropriate

inquiry is "whether the [Commissioner]'s finding of improvement to the point of no

disability is supported by substantial evidence."[11]  Substantial evidence is more than a

scintilla, i.e., the evidence must do more than merely create a suspicion of the existence

---

[10] If a claimant meets any of the following exceptions, even if medical improvement has not occurred, the individual can still be found capable of substantial gainful activity:
    (1) The claimant was the beneficiary of advances in medical or vocational therapy or technology (related to the claimant ability to work).
    (2) The claimant has undergone vocational therapy.
    (3) Based on new or improved diagnostic or evaluative techniques, claimant's impairment(s) is/are not as disabling as was thought at the time of the most recent favorable decision.
    (4) Substantial evidence demonstrates that any prior disability decision was in error.

[11] Simpson v. Schweiker, 691 F.2d 966, 969 (11th Cir. 1982); *see also* 42 U.S.C. § 405(g)

of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[12]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[13]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[14]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[15]

## B.  Burden of Proof and the Grids

In step seven of the above evaluation, the burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the

---

[12] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[13] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[14] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[15] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987).  *See also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

claimant can perform currently exists in the national economy.[17]  The Commissioner

may satisfy this burden by pointing to the Grids for a conclusive determination that a

claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the Grids when "the claimant

has a non-exertional impairment which significantly limits his or her basic work skills or

when the claimant cannot perform a full range of employment at the appropriate level of

exertion."[19]  In a situation where both exertional and non-exertional impairments are

found, the ALJ is obligated to make specific findings as to whether they preclude a wide

range of employment.[20]

The ALJ may use the Grids as a framework to evaluate vocational factors so long

as he introduces independent evidence of the existence of jobs in the national economy

that the claimant can perform.[21]  Such independent evidence may be introduced by a

vocational expert's testimony, but this is not the exclusive means of introducing such

---

[17] Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting in an initial
disability review as follows:
> In practice, the burden temporarily shifts at step five to the Commissioner. The
> Commissioner must produce evidence that there is other work available in
> significant numbers in the national economy that the claimant has the capacity to
> perform.  In order to be considered disabled, the claimant must then prove that he is
> unable to perform the jobs that the Commissioner lists. The temporary shifting of the
> burden to the Commissioner was initiated by the courts, and is not specifically provided
> for in the statutes or regulations. (Internal citations omitted).

[18] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the
Commissioner to show that the claimant can perform other work.").

[19] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229
(11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the
appropriate grid accurately describes the claimant's situation").

[20] Walker, 826 F.2d at 1003.

[21] Wolfe, 86 F.3d at 1077-78.

evidence.[22]  Only after the Commissioner meets this burden does the burden shift back

to the claimant to show that he or she is not capable of performing the "other work" as

set forth by the Commissioner.

## IV.  <u>SUMMARY OF THE RECORD</u>

Plaintiff, born on November 2, 1951, was fifty-two (52) years old at the time of the

ALJ's decision.  (R. 85.)  Plaintiff testified that he obtained his GED and attended some

college.[23]  (R. 326.)  He previously worked as a computer salesman and repairman (R.

137, 143.), and also worked as a counselor for Vision Quest in 1989, a program that

helps troubled youth.  (R.121, 143.)  Due to his own drinking problems[24], Plaintiff

quit/lost[25] his job at Vision Quest.  (R. 121, 129, 137, 141.)  He has not worked in the

past fifteen years.

### A. <u>Medical Improvement</u>

At various times between November of 1988 and July of 1989, Plaintiff was

admitted to the hospital due to his excessive drinking, extreme depression, schizoid

personality, and multiple suicide attempts.  (R.  121-154, 157, 173, 201.)  He was

repeatedly referred to detoxification and put on antidepressants.  (R. 130,138-139, 140-

141, 145,150.)  Plaintiff at times blacked out (R. 124, 131, 276) and had a gran mal

---

[22] *See id.*

[23] There are discrepancies throughout the record as to Plaintiff's level of education.  One consulting physician noted Plaintiff had only completed school through the twelfth grade (R. 230) while another noted that Plaintiff has a GED and went to junior college, but never obtained a degree.  (R. 160, 203, 276, 277.)

[24] There are frequent references in the record to Plaintiff drinking  one-fifth/ one quart/one liter of bourbon or vodka a day.  (R. 276, 27, 249, 203, 143, 131.)

[25] There is some discrepancy in the record as to how Plaitiff's job terminated.  Even those working with Plaintiff directly at the hospital could not clarify this. (R. 143.)  It is clear, however, that Plaintiff's heavy drinking caused tardiness and absenteeism which created problems in his work.

seizure (R.129, 131, 136, 141, 153.)  Although Plaintiff claimed not to have experienced

any other episodes of blackouts or seizures, Dr. R.C. Drye ("Dr. Drye") felt that he may

not have remembered them due to "patchy amnesia." (R. 145.)   However, Plaintiff was

reluctant to start any kind of alcohol treatment program.  (R. 127-128, 131-132, 141,

153.)

        Dr. Drye found that Plaintiff seemed hopeless and helpless with a sense that he

did not have much of a future. However,  Dr. Drye observed that Plaintiff's orientation

and memory were intact.  His emotions were exaggerated, but otherwise appropriate to

the discussion during the examination.  (R. 129, 130.)  Dr. Singh made similar

observations about Plaintiff (R. 173-178) as did Dr. Steven L. Weiss.  (R. 277.)  Dr.

Weiss found that despite his long history of drinking, Plaintiff's mental functioning was

quite high.  (R. 277.)  Plaintiff testified that the medication Xanax controlled his panic

attacks. (R. 331.)

        On most of Plaintiff's visits, Dr. Drye noted that Plaintiff had slurred speech and

spoke slowly and seemed to be sad (R. 131, 140, 145), but his physical examinations

did not reveal any other abnormalities.  (R. 131, 138, 145, 148, 162.)  Dr. Drye also

found that Plaintiff did not see "himself as able to function as a grownup," but instead

seemed fixated on age twelve.  (R. 137, 141.) In addition, Plaintiff showed immaturity

and rebelliousness on the MMPI.[26]  (R. 140.) Plaintiff also smoked anywhere from one

to three packs of cigarettes a day.  (R. 144, 162, 188.)

---

[26] MMPI stands for the Minnesota Multiphasic Personality Inventory which is used to determine
psychiatric problems.

On January 30, 1990, an agency psychologist completed a Psychiatric Review

Technique, finding that Plaintiff met Listing 12.04 by meeting the definition of the

disorder as described in <u>both</u> 12.04A and 12.04B(3) and (4).[27]   (R. 278.)   In March of

2001, Dr. Weiss evaluated Plaintiff and diagnosed him with alcohol dependence, alcohol

abuse, severe and recurrent depression, and schizoid personality disorder.[28]  Dr. Weiss

noted that Plaintiff had no problems with his memory, orientation, ability to perform

basic tasks, and that as noted above, was highly functioning for someone with a long

history of alcohol abuse.  He noted no problems with Plaintiff's attention, concentration,

or ability to tell right from wrong.  Dr. Weiss also concluded that Plaintiff could manage

his own money and perform other basic living activities independently.  (R. 277.)

On September 21, 2001, Dr. Gurnani completed a treating psychiatrist report with

similar findings to those of Dr. Weiss.  In addition, Dr. Gurnani noted that Plaintiff had no

problems functioning socially, but despite his clinical observations, Dr. Gurnani

concluded patient could not work. He diagnosed Plaintiff with recurrent and severe

major depressive disorder without psychosis (201), panic disorder and agoraphobia, but

---

[27] Pursuant to 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04 includes "[a]ffective [d]isorders characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." To meet this Listing, Plaintiff must satisfy the requirements in <u>both</u> Part A and Part B of this listing.   To satisfy Part A, Plaintiff must demonstrate a "medically documented persistence, either continuous or intermittent" depressive syndrome with at least four of the symptoms of this disorder described in the Listing, manic syndrome with at least three of the symptoms described in the Listing, or bipolar syndrome with episodes of both mania and depression.
    To satisfy Part B, Plaintiff must show that his mental disorder has caused "at least two of the following: [1] marked restriction of daily living; or [2] marked difficulties in maintaining social functioning; [3] or marked difficulties in maintaining concentration, persistence, or pace; or [4] repeated episodes of decompensation, each of extended duration."

[28] Schizoid Personality Disorder is defined as "a pervasive pattern of detachment from social relationships and a restricted range of expression of emotions in interpersonal settings." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 694 (4th ed. 2000) [hereinafter <u>DSM-IV</u>].

noted that Plaintiff did not appear to be in pain, no longer had suicidal thoughts, and his concentration, orientation, and memory were all intact.   (R. 193-194.)

The agency psychiatrist who completed the most recent Psychiatric Review Technique in October of 2001 for Plaintiff,[29] found Plaintiff 's depression was an Affective Disorder (R. 221) and that Plaintiff also suffered from a Personality Disorder (R. 218, 225) as well as a Substance Abuse Disorder, but that Plaintiff no longer met any of the Listings.  (R. 218.)  The agency psychiatrist found only mild restrictions on Plaintiff's daily living activities and that Plaintiff had only mild difficulties in maintaining social functioning.  Moderate limitations were found in Plaintiff's ability to maintain concentration, persistence or pace, but no episodes of decompensation were noted. (R. 228.)

The consulting agency psychiatrist also completed a Mental Residual Functional Capacity Assessment,[30] finding that Plaintiff was not significantly limited in his abilities to understand and remember or to keep sustained concentration and persistence except that he was moderately limited in his ability to maintain attention and concentration for extended periods.  (R. 232.)  Plaintiff testified to problems with his concentration.  (R. 231.)  The consulting psychiatrist also found that Plaintiff was moderately limited in his ability to complete a normal work week and perform at a consistent pace without interruptions from psychologically based symptoms.  No limitations were found on Plaintiff's ability to engage in social interaction or adapt to a work situation.  Moderate

---

[29] An earlier Psychiatric Review Technique was completed in April of 2001 with similar findings.  (R. 252-265.)

[30] An earlier Mental Residual Functional Capacity Assessment was completed in April of 2001 with similar results.  (R. 269.)

limitations were found on Plaintiff's ability to set realistic goals or make plans independently of others.  (R. 233.)

Plaintiff testified that with medication, his anxiety and depression have improved (R. 339) and that he has reduced the number of alcoholic drinks he has each day to increase the efficacy of the antidepressant he is taking.  (R. 340.)

**B.  Back Pain and Neuropathy**

On July 7, 1989, Plaintiff fell off of his roof and was admitted to the hospital.  (R. 150.)  He exhibited signs of alcohol withdrawal or Congentin toxicity including hallucinations, slurred speech, and disorientation.  (R. 150, 152.)  He had to be restrained in bed.  (Id.)  From the fall, Plaintiff had hurt his back (R. 151, 155,157) which caused pain, and made it difficult for him to get in and out of a wheelchair.  (R. 150, 154, 182.)  Plaintiff was prescribed various pain medications and fitted for a back support. (R. 150, 158.)   After his fall, in addition to the back pain, some weakening of the left lower extremity was also noted.  (R. 172.) In March of 2001, Plaintiff saw Dr. Medero who found that Plaintiff's range of motion, as well as his spinal motor, sensory, and reflex abilities were all within normal.  Plaintiff could walk without an assistive device, and did not suffer any motor deficits in his upper or lower extremities. (R. 273.)

Dr. Gopal Tatambhotla saw Plaintiff on several occasions and diagnosed him with severe peripheral neuropathy.  (R. 181, 182-183.)  Plaintiff testified that the neuropathy causes numbness in both legs and his fingertips and interferes with his sense of balance.  (R. 327.)  Plaintiff's MRI in August of 2001 showed a moderate compression deformity of the L1 vertebral body, and mild disc bulges at L3-L4 and L5-S1.  Both L4-L5 showed mild disc dessication.  (R. 185-186.)  Plaintiff frequently

complained of back pain, numbness of his feet, and gait problems, but he was generally in good health otherwise. (R. 181-182, 187-189, 270-273.) In all of his examinations, Plaintiff presented himself as someone who was alert, awake, and oriented who could engage in higher mental processes. (R. 175-177,182-183,189.) Dr. Tatambhotla prescribed painkillers for Plaintiff and told him not to drink anymore. (R. 181-182.)

Based on the above findings, on October 12, 2001, the agency medical consultant found in the most recent RFC assessment[31] that Plaintiff had the capacity to lift twenty pounds occasionally and ten pounds frequently, he could stand and/or walk for six hours in an eight hour workday, and sit for about six hours in an eight hour workday, and had unlimited push and pull capabilities. (R. 211.) Plaintiff had some postural limitations and the agency physician recommended that Plaintiff refrain from climbing a ladder, rope, or scaffold (R. 212.) Plaintiff did not have any manipulative, visual, or communicative limitations. (R. 213-214.) In terms of environmental limitations, the agency physician found that Plaintiff should avoid concentrated exposure to vibrations and avoid even moderate exposure to any "hazards." (R. 214.) Plaintiff testified that he can walk around the grocery store, but only stand for 5 minutes at a time. (R. 330.) He stated that he could sit for about an hour (R. 331, 334), and only lift up to ten pounds. (R. 331.) He testified that he takes Flexeril to alleviate intense back pain.[32] (R. 332.) Movement tends to exacerbate the pain, according to

---

[31] Similar findings had been made in an RFC Assessment done on May 31, 2001.

[32] Plaintiff testified that his prognosis was continued arthritic pain, followed by actual arthritis, followed by the need for use of a wheelchair. However, there is no evidence in the record that explicitly states this chain of events, other than evidence directly presented by the Plaintiff. (R. 334.)

Plaintiff, but he can sometimes squat.  (R. 335.)  Plaintiff testified that his neuropathy

has worsened over the years.  (R. 339.)

## V.  DISCUSSION

### A. The Listings

#### 1. Listing 12.04A and 12.04B and the ALJ's Finding of Improvement

The ALJ found that Plaintiff no longer met Listing 12.04A and 12.04B (3) and (4)

because his condition had improved.  Plaintiff was originally found to have met the

Listing by the state agency psychologist Roger L. Glover because he satisfied Listing

12.04(B), having marked limitations in his concentration, persistence, and pace, and

episodes of decompensation.  (R. 278-285.)  Plaintiff contends that neither his treating

psychiatrist, Dr. Gurnani, nor the consultative examiner, Dr. Weiss, noted any

improvement in his condition.  The Commissioner asserts that the ALJ properly found

that the Plaintiff's condition had improved since his last application for disability benefits

because Plaintiff no longer had the marked limitations or episodes of decompensation

previously found.  Furthermore, the physicians' opinions on record after March 1990 do

not evidence that Plaintiff meets any of the Listings.

The ALJ noted that Dr. Gurnani, who treated Plaintiff in 2001, concluded that

Plaintiff could not work and had recurrent and severe major depressive disorder, panic

disorder, and alcohol abuse and dependence.  Such diagnosis might have established

that Plaintiff continued to meet the criteria under Listing 12.04A.  However,  in the

Treating Psychiatrist Mental Health Report Dr. Gurnani completed, the doctor did not

find any problems with Plaintiff's thought process, content (i.e. absence of overt

delusions or suicidal thoughts), concentration, memory, orientation, ability to manage

funds, or social functioning.  (R. 193.)  The absence of mental limitations in these areas

supports the conclusion that Plaintiff no longer met Listing 12.04B.  As discussed

above, Plaintiff must meet both Part A and Part B of the definition of the disorder to

meet the Listing.

Plaintiff also asserts that the decline in his Global Assessment Functioning

("GAF") score from 75 to 60 in Dr. Gurnani's report (R. 205) evidences that his condition

worsened, instead of improved.   However, a GAF score of 60 merely means that the

Plaintiff had "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or

school functioning."[33]  While Plaintiff's overall level of functioning might have slightly

declined according to the GAF scale, a score of 60 alone does not evidence that

Plaintiff continued to meet Listing 12.04A and 12.04B[34] because "moderate symptoms"

or "moderate difficulty" do not necessarily equal the level of "marked" difficulties the

Plaintiff must prove to meet the criteria in Listing 12.04B.

In making his findings, the ALJ also considered the opinion of the consultative

examiner, Dr. Weiss.  While the recommendations of consultative examiners, such as

Dr. Weiss, are not accorded as much weight as those of a treating physician, Dr. Weiss'

report, nonetheless, supports Dr. Gurnani's findings.  While no explicit references are

made to "improvements," Dr. Weiss found that although Plaintiff was depressed, he had

no problems with memory or orientation. Moreover, Dr. Weiss noted that it was

---

[33]DSM-IV at 35.

[34]  A GAF score is only one of five axes used to assess an individual's mental disorder and capabilities.  "Where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two."  DSM-IV at 33 (emphasis added).   Therefore, the GAF score alone is not wholly indicative of Plaintiff's level of functioning, and additional evidence is necessary to determine whether Plaintiff continues to meet the Listing.

surprising that "for a person with such a long history of alcohol abuse [Plaintiff's] mental status is still at such a high level."  Dr. Weiss also found no problems in Plaintiff's attention, concentration, and judgment of right from wrong.  (R. 277.)  In sum, Dr. Weiss' findings did not include the marked limitations Plaintiff previously had when he was found to have met Listing 12.04B.

The opinions of the state agency psychologists with whom the Plaintiff takes issue are based on these same reports by Dr. Gurnani and Dr. Weiss.  And, while Dr. Gurnani included in his report a conclusory statement that Plaintiff could not work this statement was not supported by substantial evidence in the record, including the findings in Dr. Gurnani's own report.  Accordingly, the ALJ properly found that the Plaintiff's mental condition had improved because Plaintiff no longer had all of the limitations to qualify for disability under Listing 12.04A and B.

## 2.  Listing 1.04C

Plaintiff alternatively argues that the ALJ erred by failing to find that he met the requirements to be classified as disabled under Listing 1.04C, even if he does not meet Listing 12.04A and B.

To meet the requirements under Listing 1.04C, Plaintiff must demonstrate that he has a

> disorder[ ] of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord[ ] with lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically

16

acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.[35]

Plaintiff has not met his burden to show he meets this Listing.[36]  An MRI was performed in August 2001.  As Dr. Tatambhotla clinical notes disclose that there was "moderate compression deformity of L1 vertebral body," (R. 182), but the MRI revealed no stenosis.[37]  Stenosis is one of the requirements that must be found to meet Listing 1.04C.

Aside from the mild compression of L1, mild disc bulges, and mild disc dessication, the MRI showed that the Plaintiff's lumbar vertebrae were normally aligned. (R. 185.)  In addition, while Plaintiff complains of chronic pain, the pain has not affected his ability to ambulate without assistance as defined in § 1.00B2b and Plaintiff has not shown any weakness.  (R. 270.)  Plaintiff's doctors have prescribed medication to control his pain, but Plaintiff has not otherwise demonstrated the inability to ambulate effectively, which is another requirement that is necessary to meet Listing 1.04C. Accordingly, Plaintiff failed to produce substantial evidence that he met listing 1.04C, and, therefore, the ALJ did not err in finding that Plaintiff did not meet this listing.

---

[35] 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04C.  Pursuant to § 1.00B2b, an in ability to ambulate effectively is defined as "an extreme limitation of the ability to walk" where claimant has "insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s). . . .To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school."

[36] Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987) ("When a claimant contends that he has an impairment meeting the listed impairment, the burden is on the claimant to present specific medical findings that meet the various tests listed under the description of the applicable impairment . . . .")

[37] Spinal stenosis is the narrowing of the spinal canal. 4-11 Attorneys' Textbook of Medicine 11.50 (3d. 2005).  No such narrowing was present on Plaintiff's MRI.

## B. **Plaintiff's RFC and Use of the Grids**

Plaintiff contends that the ALJ should have called a vocational expert to testify, rather than relying on the Grids, because Plaintiff suffered from two non-exertional impairments, pain and severe mental impairments.

In the Eleventh Circuit, "the grids may be used in lieu of vocational testimony on specific jobs if none of the claimant's nonexertional impairments are so severe as to prevent a full range of employment at the designated level."[38]  A nonexertional impairment is one that affects the claimant's ability to meet the demands of a job other than the strength demands.[39]

The ALJ found that the Plaintiff had the RFC to perform substantially the full range of light work.[40]  Based on the record evidence discussed above, there was substantial evidence supporting the ALJ's finding that the Plaintiff's nonexertional impairments, pain and depression, were not so severe as to impact his ability to perform basic work activities in a light range of work.[41]  Plaintiff admitted, and his doctors noted, that Plaintiff's medication controlled most of the pain Plaintiff experienced, and the ALJ took proper account of Plaintiff's postural and environmental limitations, none of which

---

[38] Wolfe, 86 f.3d at 1077-78; *see also* Phillips, 357 F.3d 1232 at 1244; Passopulos v. Sullivan, 976 F.2d 642, 648 (11th Cir. 1992).

[39] 20 C.F.R. §§ 404.1569a(a) & (c).

[40] Light work is defined as work which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R.. §404.1567.

[41] Phillips v. Barnhart, 357 F.3d 1232, 1243 (11th Cir. 2004) ("[T]he  ALJ need only determine whether Phillips's nonexertional impairments significantly limit her basic work skills" which "prohibit a claimant from performing a wide range of work at a given level.")(internal quotations omitted); *see also* Foote, 67 F.3d at 1559.

considerably eroded the range of light work Plaintiff could perform.[42] (R. 21-22.) As for his mental impairments, Plaintiff now maintains a fully functional life, and none of the reports of record from the doctors, or other clinical findings, demonstrate that the Plaintiff is severely impaired in his ability to work and perform basic living tasks. Accordingly, the ALJ did not err by relying on the Grids instead of utilizing a vocational expert in determining that Plaintiff was no longer disabled because Plaintiff's RFC allowed him to perform work that exists in significant numbers in the national economy.

## VI. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Ocala, Florida, on December 22, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
The Honorable Wm. Terrell Hodges
Senior United States District Judge

Counsel of Record

[42] The ALJ noted that Plaintiff had occasional postural limitations and needed to avoid fumes, odors, gases, unprotected heights and moving machinery. (R. 23.)